Argued and submitted July 22, 1983, reversed and remanded with instructions
January 18, 1984

## BLAISDELL,
*Appellant,*

*v.*

## NELSEN et al,
*Respondents.*

(80-6-431; CA A26460)

674 P2d 1208

Michael S. Fryar, Gresham, argued the cause and filed the brief for appellant.

Stanley N. Wax, Portland, argued the cause and filed the brief for respondents.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

This is a proceeding in equity to quiet title to a strip of real property, record title of which is in defendants. The trial court upheld defendants' title. We reverse and remand with instructions to quiet title to the strip in plaintiff and for further proceedings on plaintiff's claims for trespass.

The parties are adjacent landowners in the Orchard Homes subdivision in Clackamas County. Plaintiff's parcel is located on lot 28 and defendants' on lot 27. The strip at issue is located entirely on lot 27 but has been enclosed with plaintiff's property by a fence since 1929. The strip is approximately 300 feet in length and varies in width from 28 to 36 feet.

Plaintiff's parents purchased lot 28 in 1928. The following year, plaintiff's father and the owner of lot 27 (one of defendants' predecessor in interest) worked together and erected a fence which served to divide the two properties. Plaintiff, who as a nine year old child helped put up the fence, testified that his father and the neighbor established the fenceline by having plaintiff and another child go up ahead and hold up flagged stakes while the two adults decided where the stakes should go. He stated that he did not know what his father and the neighbor were using as reference points.

Sometime shortly after the fence was built, plaintiff's family cleared portions of the strip for use as a garden. Plaintiff testified that, sometime prior to World War II, his family planted an orchard just north of the strip, with one apple tree partially located on the strip. At some point after World War II, plaintiff's family cut some trees from parts of the strip. However, following the cutting, little activity has taken place on the strip and it has been allowed to grow up with brush and briar. The fence has not been well maintained and in many places remains standing only because it is held up by heavy brush. Plaintiff has a hayfield located north of the strip, access to which is by a trail that cuts diagonally across the lower corner of the strip. That access has been used intermittently for a period in excess of 10 years.

Since the building of the fence in 1929, defendants' predecessors in interest have made varying uses of their land up to the fenceline. At one time, sheep were grazed against the fence; in a later period, the land was used to pasture horses. In

1951, the then owner of lot 27 installed woven wire on the fence.

Defendants purchased their property in 1979. In June of that year, claiming ownership of the strip, they crossed the fenceline, cleared a portion of the strip and set up a picnic area. Plaintiff protested, asserting that the fence marked the boundary between the two parcels. He eventually brought this action, claiming title to the strip either by adverse possession, "boundary by acquiesence" or "boundary by practical location." We review *de novo* to determine whether plaintiff has established any of the theories. ORS 19.125(3). Because we find the latter two bases are met on this record, we do not consider the adverse possession theory.

An examination of the Oregon cases dealing with the two theories of "boundary by acquiesence" and "boundary by practical location" reveals that the courts often have used the labels interchangeably to refer to the same theory—the establishment of a boundary other than the one in the deeds by express or implied agreement. *See, e.g., Corson v. Williford,* 44 Or App 145, 151, 605 P2d 1194 (1980) (referring to the theory as "boundary by acquiescence," but citing for support *Kincaid v. Peterson,* 135 Or 619, 297 P 833 (1931), in which the theory is referred to as "doctrine of practical location"); *see also Comment,* 28 Or L Rev 362 (1949). To avoid perpetuating this confusion, we will henceforth use the more accurate term "boundary by agreement" to refer to the theory. *Ross v. DeLorenzo,* 65 Or App 586, 591, 672 P2d 1338 (1983).[1]

There are three essential elements to establish a boundary by agreement. First, there must be an initial uncertainty or dispute as to the "true" location of the boundary. Second, the uncertainty must be resolved by an agreement, express or implied, to recognize a particular line as the boundary. Finally, the parties must evidence their agreement by their subsequent actions.[2] *Harris et ux v. Backus et al,* 212

---

[1] The term "acquiescence" also has been used in the past to denote another theory by which courts recognize a boundary line which has been mutually acquiesced in by adjoining landowners for a substantial period of time. *See Ross v. DeLorenzo, supra,* citing *Bernheim v. Talbot,* 54 Or 30, 100 P 1107 (1909). Even if the elements of an agreement are not present, the boundary line acquiesced in may be recognized in the interest of justice. This theory was not raised in the present case.

[2] In one case, this court has required a fourth element—that the acts evidencing the agreement must last the statutory period required for adverse possession. *Corson v.*

Or 695, 321 P2d 315 (1958); *Ross v. DeLorenzo, supra.* We find that plaintiff has established that the fenceline is the boundary by agreement. The manner in which the fence was erected indicates that the parties were uncertain about the location of the true boundary.[3] Plaintiff's father and defendants' predecessor in interest established the fenceline together. That conduct implies an agreement between them that the fenceline would serve as the boundary dividing the two properties. After the fence was erected, both parties' predecessors in interest limited their acts of ownership to their respective sides of the fence; for almost 50 years no one questioned plaintiff's family's right to the disputed strip. Taking the evidence as a whole, we conclude that the fenceline established in 1929 is the boundary between plaintiff's and defendants' parcels.

Reversed and remanded with instructions to quiet title to the disputed strip in plaintiff and for further proceedings on plaintiff's claim for trespass.[4]

---

*Williford, supra.* That appears to be the minority view and has been criticized as a failure to recognize the different bases for adverse possession and boundary by agreement. *See* 12 AmJur 2d, *Boundaries* § 80 (1964). In this case, the acts evidencing the agreement have existed for a period in excess of 10 years.

[3] There is, of course, *some* possibility that the parties to the erection of the original fence thought they *knew* where the boundary was and were merely laying the fence along it. Were that the case, a boundary by agreement would not be made out. *See Drury v. Pekar, supra,* 224 Or 37, 44, 355 P2d 598 (1960). However, from the evidence, we find the other inference—that the parties were uncertain as to the boundary—the more likely one. The area was dense timber; there is no suggestion there had been a recent—or any—survey; and there is no evidence that the parties established the line from one monument to another.

[4] Plaintiff also brought a claim for trespass. Because the trial court upheld defendants' record title, it made no ruling on that claim. Although plaintiff did not assign as error the trial court's failure to rule, we read *Bartell v. Hollinshead,* 47 Or App 145, 151, 617 P2d 688 (1980), to allow the trial court now to consider it.